**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**


**DRANCY ARNOLD**                                                              **PLAINTIFF**

**V.**                              **CASE NO. 5:15-CV-05287**

**WASHINGTON COUNTY, ARKANSAS;**
**SHERIFF TIM HELDER;**
**DEPUTY T.J. RENNIE; OFFICER JASON McDANIEL;**
**OFFICER TANNER JONES;**
**CHIEF OF POLICE GREG TABOR; and**
**CITY OF FAYETTEVILLE, ARKANSAS**                          **DEFENDANTS**


<u>**MEMORANDUM OPINION AND ORDER**</u>


Plaintiff Drancy Arnold alleges that police conducted a traffic stop without probable

and then used excessive force to effectuate his arrest.   Arnold seeks vindication of his

rights under the Constitution and damages for violations of the Arkansas Civil Rights Act

("ACRA"), outrage, battery, and assault.   Named as Defendants are the three officers

involved in the stop and subsequent arrest:  Washington County Deputy T.J. Rennie and

Fayetteville Police Officers Jason McDaniel and Tanner Jones.   Arnold has also sued

Washington County and its Sheriff, Tim Helder; as well as the City of Fayetteville, and its

Police Chief, Greg Tabor.

The case is now before the Court on Motions for Summary Judgment filed on behalf

of Deputy Rennie, Sheriff Helder, and Washington County (collectively, the "County

Defendants") (Doc. 31); and separately by Officers McDaniel and Jones, Chief Tabor, and

the City of Fayetteville (collectively, the "FPD Defendants")  (Doc. 28).  For the reasons

explained below, the County Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**, and the FPD Defendants' Motion is **GRANTED**.

## I. BACKGROUND

On the morning of November 27, 2013, along a busy interstate highway near West Fork, Arkansas, Deputy Rennie initiated a traffic stop of Mr. Arnold after observing that he was following a vehicle too closely. (Doc. 28-2 at 6). Once stopped on the highway's shoulder, Rennie approached Arnold's passenger side door to explain the purpose of the stop. Identifying information was obtained and a records check performed. Officer McDaniel arrived on the scene and spoke briefly with Rennie. Rennie to returned to Arnold's passenger side door, while McDaniel approached the driver's side. Officer Jones arrived a few minutes later and stood next to McDaniel. Rennie told Arnold that he was smelled the odor of marijuana and needed him to step out of the car. Arnold refused, denied the possession of marijuana, and protested the stop as a totally bogus pretext. In the course of this lengthy dialogue, Arnold refused multiple more commands to exit his vehicle. Rennie and Jones upholstered their Tasers and warned Arnold that he would be tased if necessary. Arnold remained steadfast in his defiance. But when McDaniel applied physical force to Arnold's left hand and arm, he succumbed and agreed to voluntarily exit his vehicle. The undisputed events described thus far occurred over 15 minutes.

The parties disagree, however, about what happened during the course of the next 30 seconds—beginning with Arnold freely walking to the back of his car, and ending with Rennie tasing Arnold in the back of the neck. Arnold contends that he was complying with the officers' commands when Rennie unlawfully tased him. The officers contend that

2

Arnold was resisting their efforts to cuff him, and the resulting use of the Taser was reasonable and necessary to effectuate to effectuate the arrest.

## A.  Arnold's Version of Events

Arnold, a barber, testified that he was traveling from Little Rock to Fayetteville to cut hair for his clients, who were athletes at the University of Arkansas—something he did "once every two weeks or so."  (Doc. 8 at 18).  Arnold was a few miles south of Fayetteville when he first saw Rennie's blue lights.  Although he initially believed that a different vehicle was being stopped for speeding, when Arnold realized that *he* was being stopped, he complied and pulled over to the shoulder of the highway.

Rennie approached on foot, leaned into Arnold's passenger-side window, and began asking questions.  After "talk[ing] back and forth" for ten to fifteen minutes,  Rennie said that he smelled marijuana and asked Arnold to get out of his vehicle.  Arnold refused. (Doc. 33-8 at 27).  Arnold explained that he "was on a time frame.  [He] was trying to get up there and cut hair and get back home to be with [his] family for Thanksgiving."  *Id.* at 88. Arnold denied possessing any marijuana, but said that his cousin had been driving the vehicle the night before—so perhaps that was the residual source of the odor.  Arnold complained  that he had not been following the vehicle in front of him too closely, and that Rennie had no legitimate reason to pull him over in the first place.

Arnold, an African American, subsequently explained that he was reluctant to get out of his car and feared for his life, because of police encounters he had seen on television and the Internet.  *Id.* at 27.  He believed the police pulled "a lot of black people over just for nothing."  *Id*. at 33.  Arnold told Rennie that he had been "pulled over a lot,"

*id.*, perhaps more than fifteen times between 2007 and 2013, *id.* at 34. Arnold later testified that he wanted a police supervisor present before he exited the vehicle, but admitted that he did not ask Rennie to call for one. *Id.* at 37.

According to Arnold, Rennie "started pointing the Taser at [his] head" and said if he did not get out of the vehicle, Rennie was "going to shoot him with the Taser right there in [his] face." *Id.* at 27. Arnold believed the situation was getting intense. He testified to being scared, and that his heart was beating fast. *Id.* at 28, 35. Arnold claims the fear for his life occurred when Rennie took aim with his Taser. *Id.* at 35.

It was around this time that Arnold recalls the two Fayetteville police officers arriving on the scene. *Id.* at 27-28. Arnold admits that all three officers told him to get out of his car, and in fact, they did so "quite a few times." *Id.* at 94. Nevertheless, he refused, "because there's no telling what would've happened. Somebody could lose control; you could get hit by a vehicle; or there's just a whole bunch of stuff that could happen." *Id.* at 35. Arnold said just being on the side of the interstate made him "scared because you've got cars going 70 mph, and you never know what could happen." *Id.* at 35. He concedes, however, that he never expressed these concerns to the officers. *Id.* at 87.

Arnold testified that the FPD officers then "kind of started trying to yank [him] out of the vehicle." *Id.* at 91. One officer was pulling Arnold's arm, and one was pulling his leg. Eventually, Arnold exited his vehicle because he thought "the officer was going to break [his] arm; it was hurting pretty bad." *Id.* at 92. After getting out of the car, Arnold walked back toward Rennie's patrol unit. Arnold recalls being told to put his hands on the trunk of his own vehicle. He testified that as he was placing his hands down, "they just started

jerking my arms and pulling my arms" back.  *Id.* at 93.  Arnold denies that he resisted, pushed off the car, or arched his back.  *Id.* at 39, 93.  He stated that Rennie "kind of started smashing me, grabbing me, and he just shot me with the Taser and put it close to my neck. He put it close to my neck and shot me."  *Id.* at 28.  Arnold admits that the tase did not cause him to fall down, but he did see a "white light."  *Id.* at 95.

The probes had been discharged at extremely close range and lodged in Arnold's neck.  One of the probes was removed at the scene.  But the second probe had penetrated so deeply as to require a trip to the hospital.  *Id.* at 28, 96-98; *See also,* Doc. 33-13 at 6 (records of Washington Regional Medical Center).  Medical personnel had to make two .25-centimeter incisions to remove the second probe.  *Id.* at 9.  The wound was irrigated with betadine and left open.  When the bleeding was controlled, a dressing was applied. *Id*.  Arnold was also given a tetanus shot and a prescription for antibiotics.  *Id.* at 6, 8.  His neurologic review at discharge was negative.[1]  *Id.*

While Arnold was receiving medical treatment, the police discovered a large amount of marijuana in the trunk of his car.   So Arnold was transported from the hospital to the Washington County Detention Facility, where he was held for possession of a controlled substance with intent to deliver, using force to resist arrest, and following too closely. (Doc.

---

[1] Although not in dispute for purposes of this motion, Arnold has provided a significant amount of medical records to support the extent of medical injuries he says were caused by the tasing, including residual impairments. Records from periodic follow-up visits to Arnold's neurologists—viewed in the light most favorable to Arnold—detail numerous complaints including shakiness, twitching, stuttering, bad dreams, pain in the back of the neck, and chronic severe headaches.  The list of diagnoses include a benign essential tremor, common migraines, anxiety disorder,  and possible somatoform disorder.  Arnold has been prescribed an assortment of medications for these conditions. (Doc. 33-14 at 4).

28-5 at 3; Doc. 33-2 at 6-7).  Arnold was held overnight, but he bonded out of jail at approximately 3:00 p.m. on November 28th.

On December 27, 2013, County prosecutors filed a felony information against Arnold, charging him with possession of a controlled substance with the purpose to deliver. (Doc. 33-2 at 17).  On February 2, 2015, Arnold entered a negotiated plea of guilty to the charge.  (Doc. 28-6 at 2; Doc. 33-8 at 80).  He was given credit for time served and was sentenced to probation.[2]

### B.  The Defendants' Version of the Events

### 1.  The County Defendants

Deputy Rennie's affidavit, reproduced in part below, summarizes his recollection of the traffic stop with Arnold:

> On November 27, 2013, I was conducting routine patrol when I observed Plaintiff following too closely behind another vehicle.  I engaged my emergency lights and pulled the Plaintiff over for following another vehicle too closely.
>
> During the traffic stop, I smelled the odor of marijuana coming from the Plaintiff's vehicle.  I called for back up officers to assist with the arrest.
>
> The Plaintiff was asked to get out of his vehicle multiple times by myself and back up officers from Fayetteville Police Department and refused each time.
>
> I warned the Plaintiff more than once that he would be tased if he did not comply both before he exited the car and after.
>
> Plaintiff is 6'2" tall which is taller than I am.

* * *

---

[2] There is nothing in the summary judgment record to suggest that Arnold was formally charged or convicted of following too closely or resisting arrest.

> [B]ecause the Plaintiff was continuing to move his arms and body, resisting arrest and refusing to allow officers to handcuff him, Plaintiff was warned he would be tased and, in accordance with my training, I attempted to use the taser in drive stun mode because I was close to the Plaintiff.
>
> When I engaged the Taser, the device malfunctioned and, instead of operating in drive-stun mode, the prongs deployed, and the device delivered only a partial cycle of electric pulses.[3]

Doc. 33-10, pp. 1-2.

Rennie goes on to testify that he completed all "requisite training to carry a Taser prior to the traffic stop with Plaintiff in 2013. *Id*. at 2. The training "requires the use of drive stun mode at very close ranges because there is no[t] sufficient space for the probes to spread out if the subject is too close."[4] *Id.*

Major Rick Hoyt, with the Washington County Sheriff's Office, confirmed that Deputy Rennie successfully completed the county's Taser training course, and further, than on June 7, 2011, he was issued the Taser (Model X-26) that was deployed upon Mr. Arnold. (Doc. 33-11). Hoyt states that officers "are trained to use the Taser device from a distance by aiming the device at the suspect and discharging the cartridge which deploys two metal probes into the surface (typically either clothing or skin) with which contact is made." *Id.*

---

[3] This testimony suggests a conscious awareness on Rennie's part that drive stunning for pain compliance purposes was reasonably necessary in the moment, whereas deployment of the probes— to electrically incapacitate the central nervous system—was not. Yet, it is undisputed that a prong cartridge was at all times intentionally attached to the Taser, so it is hard to reconcile—and Deputy Rennie does not explain—why it came as any surprise that the prongs forcefully deployed and deeply embedded when he pulled the trigger at point blank range at the base of Arnold's neck.

[4] Here again, Rennie acknowledges that the circumstances militated in favor of drive stun mode (but only for pain compliance in such close quarters), yet he admits to pulling the trigger while knowing that a fresh dart cartridge is attached—as if he thought mere proximity would prevent the explosion of darts through the cartridge gates.

at 1-2. However, "[o]fficers are trained to use the device in 'drive stun' mode as a pain compliance technique which delivers a lower level of force than the probes.[5] The drive-stun mode may be used when the subject is combative and the officer is not far enough away from the subject to allow a sufficient spread of the probes." *Id.* at 2. From Hoyt's perspective, after viewing the video of the traffic stop, he believes Rennie's "use of a Taser in drive stun mode in the manner that he attempted in this case was consistent with the training and the policy[6] of the Washington County Sheriff's Office." *Id.* (emphasis added).[7]

Sheriff Helder testified that he employs "a chain of command to supervise the employees in the various divisions of the sheriff's department." (Doc. 33-9 at 1). Hoyt heads the enforcement chain of command. *Id.* "When problems arise or are alleged," Helder relies on his chain of command to "handle those problems to the extent they are able." *Id.* He does not become "personally involved unless the problem is systemic or not capable of resolution by [his] staff." *Id.* Helder further maintains that he was not "personally involved in any of the incidents referenced in the Plaintiff's Complaint." *Id.*

---

[5] Major Hoyt does not explain why or how an officer would be trained to use a Taser in drive-stun mode without first removing (or discharging) the probe cartridge.

[6] The County has provided its "Use of Force" Policy (Doc. 33-7), which includes a general policy (*id.* at § 40.0), and a more specific policy for the use of "Electronic Control Devices" (*id.* at § 40.8). But the latter policy incorporates by reference "additional guidelines established in SOP," (*id.* at § 40.8). For reasons unknown, the County has not provided these supplemental "guidelines" for the Court's review.

[7] Major Hoyt confirms that a Taser may be used in "stun" mode for pain compliance purposes, and that use of this technique does, in fact, deliver less force as compared to full dart mode. But Hoyt, like Rennie, fails to explain how a Taser can be used in stun mode with a fresh (unexploded) cartridge attached. The Court finds these omissions to substantially detract from the credibility of any defense based on accidental discharge.

## 2. The FPD Defendants

McDaniel denies that he used excessive force against Arnold. (Doc. 28-3 at 4). He also denies that he witnessed Rennie or Jones using excessive force against Arnold. *Id.* at 4-5. According to McDaniel, "[a]fter Arnold exited his vehicle, I secured Arnold's right arm, but Arnold began to lock out his arms so they could not be handcuffed," and then Rennie used the Taser. *Id.* at 4. After Arnold was placed under arrest, McDaniel assisted in searching Arnold's vehicle and located "[a] black plastic trash bag with many pounds of marijuana . . . in the trunk . . . ." *Id.* at 5. Jones' affidavit is much the same as McDaniel's, but he adds that "I feared that [Rennie] might create a situation on a busy highway where one of us could be pushed, thrown or fall into one of the lanes of traffic." *See* Doc. 28-4 at 4. Jones also believes that neither he nor the other two officers used excessive force. *Id*. at 4.

## C. The Dashcam Video (Doc. 33-6)

The entire stop was captured on a video camera attached to the dashboard of Rennie's patrol unit.[8] The video begins with Rennie's patrol unit driving in the left lane of the interstate's two northbound lanes of traffic, slightly behind Arnold's vehicle, a gray Impala. Rennie nearly passes the vehicle but then drops back behind it. Rennie initiated the traffic stop at 10:12:06 a.m. on Wednesday, November 27, 2013. Both vehicles come

---

[8] Officer McDaniel's and Jones' dashcam videos (Doc. 28-7) show the same scene as Rennie's; however, McDaniel's dashcam video is obscured by Rennie's vehicle, and Jones' dashcam was situated at a greater distance from and captures fewer of the critical events than Rennie's video. Accordingly, the Court's description is taken solely from Rennie's dashcam video.

to a stop on the right shoulder of the highway. The following events occur between 10:13 a.m. and 10:56 a.m., as documented by Rennie's dashcam and body microphone. The events most critical to the excessive force claim occur over a mere 25 *seconds* between 10:27:37 and 10:28:02.

- **10:13:02**. Rennie approaches Arnold's vehicle on the passenger side, leans against the open passenger-side window, and begins to engage Arnold in conversation. Rennie explains that he stopped him because Arnold was following the vehicle in front of him too closely. Rennie asks Arnold for his name, date of birth, where he is coming from, and where he is going. Arnold responds to all questions. Rennie asks for Arnold's vehicle registration and insurance information, and then walks back to his patrol unit to report Arnold's identifying information.

- **10:19:15**. McDaniel arrives on the scene, exits his patrol unit, and speaks briefly to Rennie while the two are standing on the shoulder of the road. Rennie returns to the passenger-side window, tells Arnold that he detects the odor of marijuana, and asks him to step out of his car. But Arnold does not step out of the car—despite at least three separate commands by Rennie to do so.

- **10:20:56**. Rennie opens Arnold's passenger-side door and leans in while explaining to Arnold the reasons why he must exit his vehicle. Then McDaniel opens the driver's-side door and gestures for Arnold to get out of the vehicle. For the next several minutes, both officers repeatedly direct Arnold to get out of the car. They explain to Arnold that they smell marijuana

and that he must comply with their directions. Arnold argues with the officers, saying that he has done nothing wrong, and he suggests that the traffic stop was racially motivated. Despite numerous persuasive efforts by the officers, Arnold simply refuses to exit his car—but he does not demonstrate any violence nor direct any threats towards the officers.

- **10:25:24**. Jones arrives on the scene—specifically parking his cruiser in the right lane to create a small safety buffer. Jones then approaches Arnold's vehicle on foot, joining McDaniel at the driver's-side door. At this point it has been a full five minutes since Rennie first instructed Arnold to get out of the vehicle, and Arnold has still not complied. McDaniel leans into the car and grasps Arnold's left arm. Rennie tells Arnold that he will be tased if necessary, and at that point, Jones unholsters his Taser too.

- **10:26:04.** Rennie leans further into the vehicle with his Taser pointed, which prompts Arnold to exclaim, "Are you going to stun me because I don't want to get out of my own car?" Rennie says, "Yes, get out. You are not complying with what we're asking you. This is your last warning." But Arnold still does not comply, so McDaniel begins pulling, wrangling, and applying pressure to Arnold's left arm and hand.

- **10:27:37**.  Arnold finally concedes and McDaniel releases his hold.  Arnold steps out of the vehicle of his own accord—with no officer pulling, prodding, or even touching him.  Arnold then steps to the rear of his vehicle as McDaniel guides him from behind.  All the while, Jones and Rennie maintain their Tasers pointed at Arnold.



- **10:27:47.**  Arnold voluntarily places his hands on the trunk of his car, but McDaniel quickly directs him to move further from the roadway.



- **10:27:51.**  McDaniel says to Rennie, "Do you want to check him, or what do you want to do?"  "He's going in cuffs right now," replies Rennie.  But as Arnold steps partially out of view, something prompts McDaniel to say, "No . . . No . . . No," and then "Don't do that.  Don't do that."



- **10:27:54**. The three officers quickly hustle Arnold toward the front of Rennie's cruiser.  As they do so, McDaniel is shown in full control of Arnold's *right* arm and Rennie is shown in control of Arnold's *left* arm, while both officers are successfully pushing Arnold from behind.  Meanwhile Jones is walking in front of Arnold with his hand on Arnold's left shoulder.   In this midst of this, is when Rennie informs Arnold, "You're fixin' to get tased."



- **10:27:57.**  McDaniel and Rennie now have Arnold pinned against the hood of the SUV-style police cruiser.   From behind, McDaniel continues to grip and apply force to Arnold's right arm and hand.  Rennie continues his hold on Arnold's left arm, while also pressing his Taser into Arnold's back.  Meanwhile, Jones is braced to Arnold's immediate left, providing cover to Rennie and McDaniel with his own Taser aimed at Arnold's torso from very close range.



- **10:27:58.**  Although it's not clear why, Arnold begins to rise from the hood, causing McDaniel to say again, "Don't do that. Don't do that.  You're fixin' to get tased.  Don't do it, dude."



- **10:28:00.** Immediately before Rennie's Taser is deployed, Arnold stands straighter, but both of his arms remain secured—one held by McDaniel, the other by Rennie, and Jones's Taser continues at the ready.



10:28:00 Before Tase

- **10:28:00.** Rennie then moves his Taser to the base of Arnold's neck and pulls the trigger. Arnold reacts audibly in pain, but he is not incapacitated—as one might expect from a successfully "tased" subject.



10:28:00 Tased

- **10:28:01**.  Rennie threatens Arnold with the prospect of being "tased again," while Jones finally moves in to assist McDaniel with cuffing.



- **10:28:21**.  The officers walk Arnold toward the FPD patrol units.  Rennie walks beside Arnold, still holding the Taser up to his neck, where the probes have embedded.  Arnold is taken to Jones' patrol unit, and he and all three officers disappear from view.  The audio picks up one of the officers reading Arnold his Miranda rights.  Arnold says, "I have never been tased a day in my life."  An officer says something to the effect that the probes are "in there good," and tells Arnold that EMS is on its way.

- **10:47:04.**  The officers search Arnold's vehicle.  One of the officers opens the trunk, and a black plastic bag comes into view.  The officers then discuss the strong smell of marijuana coming from the trunk.  McDaniel asks Rennie to open the black bag, and once he does so, the officers exclaim that the bag contains marijuana.  Rennie removes the bag from the trunk and places it on the hood of his patrol unit.  The officers take turns lifting the bag, marveling at its weight.

- **10:55:41**.  Rennie receives a call and recounts the events leading up to the arrest.  At one point, he tells the caller, "I was trying to drive-stun him, but he kept moving, and it shot both probes on the back of his neck."[9]

## II.  SUMMARY JUDGMENT LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Court must view all evidence and inferences in the light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins. Co.*, 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

---

[9] *See* footnotes 3, 4, 5, 6, and 7, *supra*.

## III. DISCUSSION

Section 1983 provides a federal cause of action for the deprivation under color of law of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of state law and violated a right of the plaintiff's that is secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). The deprivation of the constitutional right must be intentional, as mere negligence will not suffice to state a claim under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

### A.  County Defendants' Motion for Summary Judgment (Doc. 31)[10]

### 1.  Probable Cause for Traffic Stop, Detention, and Arrest

The County Defendants' first argument is that there was sufficient legal justification to  stop Arnold's vehicle, briefly detain him, and later arrest him, and therefore they entitled to judgment on these claims. Arnold's response fails to address these points at all. The record reveals that he pleaded guilty to the charge of possession of a controlled substance with intent to deliver, and thus it follows that his guilty plea bars any claim he might have that Deputy Rennie lacked probable cause to arrest him. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). The County Defendants are therefore entitled to summary judgment on all claims that concern the validity of the traffic stop, brief detention, and arrest.

---

[10]  The County Defendants' Motion does not address any of Arnold's state law claims, so they will not be discussed here.

## 2. Qualified Immunity, Excessive Force, and Accidental Discharge

The County Defendants' next argument is that Deputy Rennie is entitled to qualified immunity, because his use of the Taser was reasonable under the circumstances. "To determine whether an officer is entitled to qualified immunity, [the court should] ask: (1) whether the facts the plaintiff presented, when viewed in his favor, show that the conduct of the officer violated a constitutional right, and (2) whether that constitutional right was clearly established at the time of the incident such that a reasonable officer would have known his or her actions were unlawful." *Neal v. Ficcadenti*, 895 F.3d 576, 580 (8ᵗʰ Cir. 2018)(internal citations omitted). *See* also, *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

"Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "An officer's use of force violates the Fourth Amendment if it is objectively unreasonable in light of the facts and circumstances of the particular case, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. "This calculus allows 'for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Thus, in determining whether the amount of force used by the officers here was reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests

at stake." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). Even where the injury is merely "de minimis," that "does not necessarily foreclose a Fourth Amendment excessive-force claim, [if] the force alleged was not reasonable under the circumstances ." *Hemphill v. Hale*, 677 F.3d 799, 801 (8th Cir. 2012)(cleaned up).

The assessment of objective reasonableness generally "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is *actively* resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (emphasis added). In taser-force cases specifically, it was well established at the time of this incident that the Eighth Circuit applied these very same reasonableness considerations. *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). Use of force by a Taser is "least justified" when officers confront (1) a misdemeanant, (2) who does not flee, (3) is nonviolent, (4) is not actively resisting arrest, and (5) poses little or no threat to the security of officers or the public. *Id.*

Here, Arnold was pulled over based on Rennie's subjective assessment of a minor traffic code violation—arguably making him even less serious than a suspected misdemeanant. Arnold did not flee during the course of the stop, nor at any other time. While it is true that Arnold fussed and argued for longer than he probably should have, he was nonviolent. Thus, the first three considerations are easily resolved in Arnold's favor. The remaining two considerations are conjoined. Both Arnold and Officer Jones have expressed safety concerns over the interstate traffic whizzing nearby while all of these events were unfolding. That said, there was not a moment when the scrum ventured into the right lane, much less the left lane where passing traffic had been funneled. So that

brings us to the final and most difficult consideration: whether Arnold was *actively* resisting arrest, so as to justify Rennie's use of the Taser. And this is why the Court set out the facts above in such granular detail.

Defendants make much of the fact that Arnold did not comply with their commands to exit his vehicle, despite numerous warnings that he would be tased as a consequence. It is true that the officers demonstrated great patience and restraint while they attempted to coax Arnold out of his vehicle. But the use of force here occurred 25 seconds *after* Arnold had completely and voluntarily complied with those earlier commands. So Arnold's earlier non-compliance has little to do with anything.

Next, the Defendants argue that once Arnold did step out of his vehicle, he resisted being handcuffed and refused to obey the officers' orders. Defendants further contend that they specifically warned Arnold to stop struggling, else he would be tased. Having viewed the video footage many dozen times, the Court agrees that Arnold was not relaxing his arms or otherwise cooperating in the process of being cuffed. But does lack of cooperation alone—without something more—equal the sort of active resistence that is necessary to justify the use of force by taser? The Court believes the answer is "no," based on the particular facts and circumstances presented in *this* case—which is why the Court included the still images in its narration of the facts above. As depicted in those images before Rennie pulled the trigger, the video evidence shows Arnold being collectively restrained by McDaniel and Rennie, with Jones ready to pounce if necessary. As the Eighth Circuit observed in *Brown*, when multiple officers are present and demonstrably capable of containing a non-violent, non-fleeing, traffic offender, the mere failure to cooperate with law enforcement presents a jury question as to whether there was a "realistic threat to [officer]

safety or whether it constituted nothing more than an affront to the [officer's] command authority." *Brown*, 574 F3d at 498.[11]

Finally, Rennie maintains that he did not *intend* to deploy the Taser probes but instead planned only to drive-stun Arnold. According to Rennie, the Taser's battery malfunctioned during the incident, causing the accidental discharge of the probes—an unintended result, for which he must be granted qualified immunity. As foreshadowed in the background section above, the Court finds this suggestion to present substantial questions of fact and credibility for a jury to determine.[12]

To be clear, Rennie is not suggesting that he merely drive-stunned Arnold. According to Rennie's affidavit: "When I engaged the Taser, the device malfunctioned and, *instead of operating in drive-stun mode*, the prongs deployed, and the device delivered only a partial cycle of electric pulses." (Doc. 33-10, p. 2) (emphasis added). Rennie is

---

[11] *Compare*, however, Eighth Circuit cases upholding the reasonableness of taser force where arrestees failed to cooperate, and/or failed to provide their hands for purposes of cuffing. *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011)(After initially complying, arrestee lunged out of a window); *Carpenter v. Gage*, 686 F.3d 644, (8th Cir. 2012)(Arrestee physically resisted initial commands); *Brossart v. Janke*, 859 F.3d 616 (8th Cir. 2017)(Arrestee had earlier made serious threats of violence upon officers and later demonstrated classic passive aggressive behavior); and *Ehlers v. City of Rapid City*, 846 F.3d 1002 (8th Cir. 2017)(Arrestee actively resisted officer's commands to stop walking away, and in the course of a physical takedown reasonable safety concerns were presented by the subject's free hand). In these cases the totality of the facts favored a finding of qualified immunity, including specifically unique facts in each case that demonstrated why the officer's fear for personal or public safety was imminent and beyond serious debate.

[12] In *DeBoise v. Taser International*, 760 F.3d 892, 895 n.5 (8th Cir. 2014), the Court explained that "[d]eploying the taser in drive stun mode means that an officer removes the cartridge from the taser and applies the taser so as to make direct contact with the subject's body." In the instant case, however, when Rennie pulled the trigger on his Taser, metal prongs deployed into Arnold's neck. Clearly, then, the cartridge containing the prongs was not removed prior to the tasing.

stuck with this incredible story, because this is what he reported when calling from the scene to explain why taser probes were embedded in the back of his arrestee's neck.[13] But nowhere does Rennie ever explain why or how the deployment of the probes was an unintended malfunction, given that an unexploded probe cartridge was attached to the end of his Taser, and given that he *did intend* to pull the trigger.

Based on the particular facts and circumstances presented in this case, and construing those facts in the light most favorable to Arnold, (*i.e.* that he was a non-violent, non-fleeing misdemeanant who was not actively resisting arrest and did not pose an actual or perceived safety threat to the officers), the Court cannot find on summary judgment that Rennie is entitled to qualified immunity. Reasonable minds viewing the video may disagree as to whether or not, at the time of the tasing, Arnold was actually resisting arrest or whether Rennie reasonably perceived him to be resisting arrest. But the possibility of multiple *reasonable* interpretations of the very same video does not resolve a potential jury question—rather, it begs for a jury to act as the ultimate fact finder.

### 3. Liability of Sheriff Helder

As for Sheriff Helder's personal involvement in the tasing, Arnold testified that he was not really sure if Helder came to the scene of the traffic stop in question. *Id.* at 50. Arnold sued Helder "because those are his employees, and that's who he hires. And he should do a better choice of select[ing] who he hires, and how he trains them. They need to be trained correctly." *Id.* at 51. Arnold does not believe that Helder thoroughly interviewed prospective law enforcement officers to "see what type of person they are to do the job." *Id.* at 52. In Arnold's view, officers should be made to undergo psychological

---

[13] Doc. 28-7, at time mark 10:55:41.

evaluations and six months of training, and they should be instructed that the Taser should only be used at the shoulders or below. *Id.* at 53-54.

Sheriff Helder maintains that the Amended Complaint fails to allege any actionable wrongdoing on his part and that the claims against him should be dismissed. The law is clear that a claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability." (internal quotations omitted)). "To establish direct personal liability of the supervisory defendant, [a plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)).

In Arnold's response to the Motion for Summary Judgment, he does not allege that Sheriff Helder was personally involved in the traffic stop or in the use of the Taser. Arnold does not even claim that Helder was aware of any of the events at issue in the case until after a lawsuit was filed. Accordingly, there is no reason to hold Helder liable based on his personal involvement, and he is entitled to summary judgment on the individual capacity claim against him.

Arnold also argues that Helder should be held liable as a supervisor based on his failure to supervise Rennie. The Eighth Circuit in *Parrish v. Ball*, 594 F.3d 993 (8th Cir.

2010), set forth the requirements to establish supervisory liability on a failure-to-supervise claim. The Court stated:

> For [the s]heriff . . . to have violated [Plaintiff's] constitutional rights by failing to supervise [a deputy, Plaintiff] must show that [the] Sheriff:
>
> 1)  Received notice of a pattern of unconstitutional acts committed by subordinates;
>
> 2)  Demonstrated deliberate indifference or tacit authorization of the offensive acts;
>
> 3)  Failed to take sufficient remedial action; and
>
> 4)  That such failure proximately caused injury to [Plaintiff].

*Id.* at 1002 (citations omitted). Here, the summary judgment record, even when viewed in the light most favorable to Arnold, reveals nothing that suggests that Helder received any notice of a pattern of unconstitutional acts committed by any of his subordinates. The failure-to-supervise claim therefore fails.

Finally, Arnold contends that Helder should be held liable based on his failure to train Rennie. A failure-to-train claim may constitute the basis for supervisory liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Otey v. Marshall*, 121 F.3d 1150, 1156 (8th Cir. 1997) (quotation omitted). Additionally, "[t]he Plaintiff must . . . prove that the alleged failure to train 'actually caused' the constitutional deprivation." *Parrish*, 594 F.3d at 1002 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (applying the same standard to supervisory liability failure to train claim as to official capacity failure to train claim)). The Court finds that there is no evidence in the record to support the contention that Helder knew or should have known that a failure to train Rennie not to use excessive force would cause him to engage in that very behavior. *See id.* at 1002-03. Therefore, the failure-to-train claim also

fails, and Helder is entitled to summary judgment on all individual capacity and supervisory liability claims.

### 4. Official Capacity—County Liability

The final argument in the County Defendants' Motion for Summary Judgment is that Sheriff Helder should not be held liable in his official capacity. A suit against Sheriff Helder in his official capacity is the equivalent of a suit against Washington County. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). "[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish Washington County's liability under section 1983, a plaintiff "must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted).

The County's use-of-force policy provides that: "Law enforcement officers shall use only that force that is reasonably necessary to effectively bring an incident under control or while protecting the lives of the officer or another." (Doc. 33-7 at 4). With respect to the use of "Less Lethal Force," policy 40.3 provides:

> Where deadly force is not authorized, officers should assess the incident in order to determine which less lethal technique or weapon will best de-escalate the incident and bring it under control in a safe manner.
>
> Law enforcement officers are authorized to use less lethal force techniques and issued equipment for the resolution of incidents, as follows:
>
> •    To protect themselves or another from physical harm
> •    To restrain or subdue a resistant individual
> •    To bring an unlawful situation safely and effectively under control

Less lethal force weapons and methods:

      •      A deputy is not permitted to use a weapon unless qualified in its proficient use as determined by training procedures.

      •      Only less lethal weapons authorized by the Sheriff or his designee may be used.

*Id.* at 4-5.

With respect to Electronic Control Devices, policy 40.8 provides:

It is the policy of this agency to use only that level of force that is reasonably necessary to control or otherwise subdue violent or potentially violent individuals. Authorized Washington County deputies, in accordance with this use of force policy and additional guidelines established in SOP, may use electronic control devices.

*Id.* at 8.[14]   The policy does not cover where on the body the electronic control device should be used.

Arnold contends the County's Taser policy is inadequate because it does not prohibit officers from using a Taser against a non-violent, restrained individual, and it also does not prohibit the use of a Taser in a detainee's neck area. In order to prevail on an official capacity claim, Arnold must show that the County's existing written policy or a pattern of persistent and widespread unconstitutional acts was the moving force behind the constitutional violation he suffered. *See, e.g., Jane Doe A v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990). Upon reviewing Arnold's response to the Motion for Summary Judgment, he concedes that the County's policy does, in fact, discuss instances when the use of "less lethal" methods are authorized. Although Arnold believes that Rennie used his Taser on one occasion in a manner that was unconstitutional, that

---

[14] The Court has not been provided any standard operating procedures with respect to the use of Tasers.

fact alone is insufficient to establish that a County policy caused the constitutional deprivation, or else that there otherwise existed a pattern of widespread unconstitutional conduct that caused the deprivation.

As for Arnold's failure-to-train claim, a local government may be held liable if the failure to train or supervise the offending actor caused the constitutional deprivation at issue. In *Parrish*, the Court set forth the requirements to establish governmental or official capacity liability based on a failure to train. *Parrish*, 594 F.3d at 997. It stated that a government may be subject to liability for inadequate training of its employees where:

> (1) the [county's] . . . training practices [were] inadequate; (2) the [county] was deliberately indifferent to the rights of others in adopting them, such that the "failure to train reflects a deliberate or conscious choice by [the county];" and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury.

*Id.* (internal citation omitted). Even where it is established that only minimal training is received, "that finding alone will not satisfy a § 1983 claim for failure to train." *Id.* Instead, a plaintiff must demonstrate

> that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

In the case at bar, Arnold does not contend that Rennie failed to undergo training on law enforcement duties, including training on when it was appropriate to use deadly and non-deadly or less-lethal force, as well as on the use of a Taser. Instead, his argument is that Rennie should have been trained on when it is *in*appropriate to use excessive force, in violation of the Constitution. The fallacy of this argument is that when an officer is trained on when it is appropriate to use force, this training necessarily teaches officers

when such use of force is inappropriate. The summary judgment record does not contain any evidence of a deficiency in the County's training of deputies, nor does the record suggest a causal relationship between a failure to train and the alleged constitutional violation at issue here. The Court does not believe that there is an obvious need to train officers *not* to use excessive force against an arrestee. *See Parrish*, 594 F.3d at 999 (no "patently obvious need to train an officer not to sexually assault women, especially where there is no notice at all that such behavior is likely"); *see also Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996) (failure to follow policy does not state a claim for relief under 42 U.S.C. § 1983. The County Defendants are therefore entitled to summary judgment on the failure-to-train claim.

Finally, Arnold asserts an official capacity claim based on a failure to supervise County deputies. He points out that the policy on the use of Tasers provides that Tasers should only be used to subdue a violent or potentially violent suspect. He also argues that the County Defendants failed to properly investigate or discipline officers for violations of the policy. (Doc. 41 at 14). Specifically, Arnold argues that the Sheriff's Office has a policy and

> custom of failing to supervise its deputies that led to the tasing of Plaintiff
> . . . . [T]he supervisors of Officer Rennie found no fault in his actions. There
> was no disciplinary action taken against Officer Rennie or additional training
> ordered. Therefore, this policy or custom caused Plaintiff to be shot in
> violation of the Fourth and Fourteenth Amendments.

*Id*. at 15.

The summary judgment record, however, contains no evidence of a custom, policy, or widespread practice of failing to supervise deputies or failing to investigate use-of-force complaints. There is no indication that, prior to Arnold's tasing, Washington County was

on notice that its supervision of its deputies' use of force or its investigation into use-of-force complaints was so lacking that it should have been aware that its procedures were inadequate and likely to result in a constitutional violation. *Cf. Parrish*, 594 F.3d at 999. Accordingly, County Defendants are entitled to summary judgment on the failure-to-supervise claim as well.

### B. FPD Defendants' Motion for Summary Judgment (Doc. 28)

### 1. Traffic Stop, Brief Detention, and Probable Cause for Arrest

The FPD Defendants' first argument is that they are entitled to summary judgment as to the legality of Arnold's traffic stop, detention, and eventual arrest. As discussed in Section III.A.1, *supra*, Arnold does not address these claims in his response to the summary judgment motion, and they are therefore conceded. The FPD Defendants are entitled to judgment on these claims.

### 2. Excessive Force and Failure to Intervene

Next, McDaniel and Jones argue that they did not use excessive force on Arnold. Jones maintains that the only physical contact he had with Arnold was when he helped escort him to the rear of the patrol unit. McDaniel contends that his only physical contact with Arnold was when he grabbed Arnold's right arm when Arnold was still seated in his own vehicle, and later, when he grabbed Arnold's right arm again to handcuff him after he exited his vehicle. The dashcam video shows that neither McDaniel nor Jones deployed a Taser. At most, Jones pointed a Taser at Arnold, and both Jones and McDaniel restrained Arnold by the arms. Arnold does not argue in response to the Motion for Summary Judgment that such behavior constitutes excessive force.

Instead, Arnold contends that McDaniel and Jones should be held liable for failing to intervene to prevent Rennie's use of the Taser in violation of Arnold's constitutional rights. The Eighth Circuit has "recognized that 'one who is given the badge of authority of a police officer may not ignore the duty imposed by his office' by failing to act to prevent the use of excessive force." *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009) (quoting *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981)). "[A] police officer may be liable if he does not intervene to prevent the use of excessive force when '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015) (quoting *Nance*, 586 F.3d at 612). With regard to the opportunity to intervene, the Eighth Circuit in *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009), noted that "the duration of the episode [must be] sufficient to permit an inference of tacit collaboration."

Here, the "duration of the episode" was less than 30 seconds—from the moment Arnold stepped out of his car, to the moment Rennie tased him. In that time, McDaniel and Jones were not standing idly by, merely observing Rennie, but they were instead actively involved in moving Arnold from his car, to the roadside, to Rennie's vehicle, and then securing his arms to apply handcuffs. The Eighth Circuit has held that if an officer is "occupied with another person on the scene," this fact tends to weigh against the notion that the officer had both the opportunity and means to intervene and stop another officer from doing harm. *Robinson*, 791 F.3d at 829.

Even if the Court assumes that Rennie's tasing of Arnold qualifies as excessive force, there are no facts to indicate that either McDaniel or Jones had a duty to intervene

to stop the tasing when they had, at most, only seconds of notice before Rennie shot Arnold with his Taser.  Rennie had been pointing his Taser at Arnold for a significant period of time before the shooting, and the other officers were given no advance warning—other than a second or two—that he would actually shoot.  Moreover, despite the fact that the City of Fayetteville's policy on Tasers—which McDaniel and Jones were familiar with—specified that Tasers should not be deployed in the "neck . . . unless officers are defending themselves from violent attacks," (Doc. 42-2 at 7, § 4.10.7(B)(2)), the dashcam video shows that Rennie pointed his Taser at Arnold's neck for no more than one or two seconds just before shooting him.  Accordingly, no reasonable jury could find that such a brief time frame would provide sufficient opportunity or means for an officer to stop another officer from deploying his Taser.  Further, such a brief time frame could not possibly permit a reasonable inference that McDaniel and/or Jones were tacitly collaborating with Rennie to use excessive force.  This claim is therefore dismissed.

### 3.  Official Capacity Liability

Arnold has presented no evidence that Chief Tabor was involved in, or even aware of, the traffic stop and Taser use until after the stop occurred.  To the extent Arnold asserts individual liability claims against Tabor, they are subject to dismissal.

Next, Arnold believes the City of Fayetteville failed to train its officers on how to respond to individuals who have not used violence and have given no indication they will become violent.  The Court finds that Arnold's failure-to-train argument lacks merit.  First, he does not contend that the City of Fayetteville's use-of-force policy was either unconstitutional or the moving force behind his alleged constitutional deprivation.  Instead, he only references the City's policy to bolster his argument that the FPD Defendants had

a duty to intervene to prevent *Rennie's* use of force.  Second, Arnold has failed to establish a causal link between the City's alleged failure to train and the alleged unconstitutional act. Third, he has failed to establish a causal connection between any alleged failure to supervise by Tabor and the alleged unconstitutional act.  Accordingly, the FPD Defendants are entitled to summary judgment on all official capacity claims.

### 4.  Arkansas Civil Rights Act

The FPD Defendants argue that there is no evidence they violated the Arkansas Civil Rights Act ("ACRA") and that this claim should be dismissed.  The ACRA at Ark. Code Ann. § 16-63-105(c) expressly instructs courts to look to federal civil rights law when interpreting the Act. Therefore, the same analysis applied above dictates that the Court must grant the FPD Defendants' Motion for Summary Judgment on the excessive force and failure-to-intervene claims made under the ACRA, just as the Court did on the same claims brought under Section 1983.

### 5.  Assault, Battery, and Outrage

The FPD Defendants correctly point out that, under Arkansas law, claims for assault and battery must be brought within a year of the alleged occurrence.  *See* Ark. Code Ann. § 16-56-104.  Here, the traffic stop took place on November 27, 2013, and the lawsuit was filed on November 24, 2015—more than one year after the alleged causes of action for assault and battery accrued.  These claims will therefore be dismissed as time-barred. And even though Rennie did not move for summary judgment as to any state law claims, the assault and battery claims against him will be dismissed *sua sponte* as time-barred.

Unlike battery, it appears the tort of outrage is subject to a three-year limitations period. See *McQuay v. Guntharp*, 331 Ark. 466, 963 S.W.2d 583 (1998). The following elements must be established for an outrage claim:

> (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) the actions of the defendants were the cause of plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Crockett v. Essex*, 19 S.W.3d 585, 589 (Ark. 2000) (citing *Angle v. Alexander*, 945 S.W.2d 933 (Ark. 1997)). Arkansas courts "give a narrow view to the tort of outrage, and require clear-cut proof to establish the elements in outrage cases. Merely describing the conduct as outrageous does not make it so." *Id.* (cleaned up and citations omitted).

Viewing the facts in the light most favorable to Arnold, they do not rise to the level of the tort of outrage. McDaniel and Jones did not tase Arnold, nor do the facts show that they acted in concert with Rennie to cause the tasing. While the traffic stop and subsequent tasing may have caused Arnold to suffer physical and emotional distress, the actions of the FPD officers do not amount to outrage as a matter of law. The claim will be dismissed as to the FPD Defendants.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the Motion for Summary Judgment (Doc. 31) filed by Deputy Rennie, Sheriff Helder, and Washington County is **GRANTED IN PART AND DENIED IN PART.** The Motion is **GRANTED** as to all claims **EXCEPT**: (1) the excessive force claim brought against Deputy Rennie in his individual capacity, pursuant to Section 1983 and the Arkansas Civil Rights Act, and (2) the state law

claim for outrage against Deputy Rennie, which was not addressed in the Motion for Summary Judgment. All other claims against the County Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment (Doc. 28) filed by Officer McDaniel, Officer Jones, Chief Tabor, and the City of Fayetteville is **GRANTED**, and all claims against them are **DISMISSED WITH PREJUDICE**.

The Court will issue a separate order setting a date for the trial of the remaining claims.

**IT IS SO ORDERED** on this 30th day of September, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE